Garnsey v. Mundy.

---

GARNSEY and wife vs. MUNDY and others.

1. A voluntary deed of trust, executed under the supposition that it was revocable, and intended so to be, but reserving no power of revocation, and otherwise unadvised, improvident, and contrary to the intention of the grantor, set aside.

2. That infant children of the grantor are beneficiaries under the deed will not prevent the relief.

---

On final hearing, upon pleadings and proofs.

*Mr. W. R. Martin*, of New York, for complainants.

THE CHANCELLOR.

On the 4th of February, 1861, the complainant, Sarah M. Garnsey, who was then a single woman, (her maiden name being Sarah M. Mundy,) and of the age of about twenty-one years, was seized in her own right in fee, in possession, through inheritance from her father, James Mundy, deceased, of a parcel of unimproved farming land, of about seven acres, in Middlesex county, in this state, and was also the owner of an undivided third of the remainder, in fee, of two other lots there—one a wood lot of about two acres, and the other the house lot, containing about nine and a half acres, which had been set off to her mother, Elizabeth Mundy, in dower. She had no other property, real or personal. By a deed of that date, she conveyed, in fee, to her mother, for the expressed consideration of natural love and affection to the grantor's daughter, Elmina May, and of fifty cents to her paid by her mother, the whole of said property, in trust as follows :

"That the said Elizabeth Mundy shall and will hold, use, occupy, and rent the same, and receive the rents, issues, and profits thereof, to and for the maintenance of said Elmina May Mundy, until she shall arrive at the age of twenty-one years; or, in case of her death, the said Elizabeth Mundy, her heirs or assigns, shall pay the rents or profits arising, as above, to the said Sarah M. Mundy; and, in further trust, to convey the land and premises, with the appurtenances hereinbefore mentioned, in fee simple, to the said Elmina May Mundy, or in equal shares to her and any other children of said Sarah M. Mundy, (should there be any other,) when the youngest of said children shall have attained the age of twenty-one years; and in the event that no issue of the said Sarah M. Mundy shall survive to inherit the same, that the estate herein named shall be conveyed according to the direction of the executor of the will of the said Sarah M. Mundy, heretofore made."

In 1864, Sarah M. Mundy was married to Silas Garnsey.

The bill is filed by her and her husband, against her two children and her mother, the trustee, to set aside the deed.

The property, at the time of making the conveyance in question, was and still is of but little value as farming land. The buildings upon the house lot, which alone was improved, were old and dilapidated, and have gone to decay, and even the fences on the premises are down. The trustee, who is a woman of advanced age, was and is wholly without means, except her dower.

The deed was wholly voluntary. It was made at the suggestion, and on the advice of the grantor's mother, and of her uncle, Dr. Jacob Martin, her mother's brother. The grantor neither proposed nor suggested it. Indeed it appears she knew nothing of it until it was presented to her for her signature, and she was urged by her mother and her uncle to execute it "for her good." Their motive, they say, was to save the property for her, to prevent her from improvidently disposing of it. No professional advice whatever was taken. The deed was drawn by a son of Dr. Martin, at the latter's direction, and its execution was witnessed by Dr. Martin, who, being a commissioner of deeds, took the grantor's acknowledgment. The grantor had no advice whatever, except that which her mother and uncle gave her. Not only was she not consulted in regard to the matter in any way, but it is clear that she did not understand the provisions of the deed, nor their effect. She did not suppose that the effect of the conveyance would be to place the property beyond her reach and control. Nay, her mother and uncle both supposed that the trust was revocable, and that the grantor, under it, retained full power to sell the property with the trustee's consent. The conveyance not only deprived the grantor of all her property, without reserving a power of revocation to enable her to meet the exigencies of life, but the arrangement which it made was in other respects injudicious, disadvantageous, and improvident. The motives and intentions of the mother and uncle, were most praiseworthy. Their design, manifestly, was simply to put the property in such a position,

that the grantor could not dispose of it without her mother's consent and concurrence. They, in good faith, urged her to make the deed. She and they were alike under an erroneous impression as to the effect of it. From the operation of such a conveyance, made under such circumstances, equity will relieve the complainants.

The rigidity of the ancient doctrine, that a voluntary settlement, not obtained by fraud, is binding on the settlor, and will not be set aside in equity, although the settlor has not reserved a power of revocation, (*Villers* v. *Beaumont,* 1 *Vern.* 100; *Petre* v. *Espinasse,* 2 *M. & K.* 496; *Bill* v. *Cureton,* 2 *M. & K.* 503;) has been relaxed by modern decisions. In the case first cited, Villers *v.* Beaumont, decided in 1682, the Lord Chancellor said: "If a man will improvidently bind himself up by a voluntary deed, and not reserve a liberty to himself by a power of revocation, this court will not loose the fetters he hath put upon himself, but he must lie down under his own folly." Recent cases, however, have narrowed the doctrine, and have held not only that the absence of a power of revocation throws on the person seeking to uphold the settlement the burden of proving that such a power was intentionally excluded by the settlor, and that in the absence of such proof the settlement may be set aside, but that equity will set aside the settlement on the application of the settlor, where it appears that he did not intend to make it irrevocable, or where the settlement would be unreasonable or improvident for the lack of a provision for revocation.

In *Everitt* v. *Everitt,* 1870, *L. R.,* 10 *Eq.* 405, a case almost precisely similar in its facts to that under consideration, a voluntary settlement was set aside on the application of the donor. The court said: "It is very difficult indeed for any voluntary settlement, made by a young lady so soon after she attained twenty-one, to stand, if she afterwards changes her mind and wishes to get rid of the fetters which she has been advised to put upon herself."

In *Wollaston* v. *Tribe,* 1869, *L. R.,* 9 *Eq.* 44, a voluntary gift,

which was not subject to a power of revocation, but was not meant to be irrevocable, was held to be invalid, and was set aside on the donor's application. In pronouncing the decree, the court said: "Of course, a voluntary gift is perfectly good if the person who makes it knows what it is, and intended to carry it into execution."　　✓

In *Coutts* v. *Acworth*, 1869, *L. R.*, 8 *Eq.* 558, it was held that "where the circumstances are such, that the donor, in a voluntary settlement or gift, ought to be advised to retain a power of revocation, it is the duty of the solicitor to insist on the insertion of such power, and the want of it will, in general, be fatal to the deed."

In *Prideaux* v. *Lonsdale*, 1863, 1 *De G. J. & S.* 433, a voluntary settlement, which the settlor was advised to execute, by persons under whose influence as regarded money matters she was, and which subjected her property to trusts, and contained provisions which the court thought it was impossible to suppose she understood, and against which she ought to have been advised and cautioned, was set aside.

In *Hall* v. *Hall*, 1872, *L. R.*, 14 *Eq.* 365, it was held that a voluntary settlement should contain a power of revocation, and if it does not, the parties who rely on it must prove that the settlor was properly advised when he executed it, and that he thoroughly understood the effect of omitting the power, and that he intended it to be excluded from the settlement; and, further, if that is not established, and the court sees, from the surrounding circumstances, that the settlor believed the instrument to be revocable, it will, even after the lapse of twenty years, and the death of the settlor, interfere and give relief against it. The decree in that case was reversed. *L. R.* 8 *Chan. Ap.* 430, (1873.) In his opinion, however, Selborne, L. C., said: "The absence of a power of revocation in a voluntary deed, not impeached on the ground of any undue influence, is, of course, material, where it appears that the settlor did not intend to make an irrevocable settlement, or where the settlement itself is of such a nature, or was made under such circumstances, as to be unreasonable and

improvident, unless guarded by a power of revocation."
And Sir W. M. James, L. J., said: "The true rule is
that which was laid down by Lord Justice Turner, in *Toker*
v. *Toker*, 3 *DeG. J. & S.* 487, 489, that the absence of a power
of revocation, is a circumstance to be taken into account, and
is of more or less weight, according to the circumstances of
each case.

*Forshaw* v. *Welsby*, 1860, 30 *Beav.* 243, was a case where
a voluntary settlement was made by one, in extremis, on his
family. It contained no power of revocation, in case of the
settlor's recovery. On his recovery it was set aside on his
application, on the ground that it was not executed with the
intention that it should be operative in case of his recovery
from his illness. See also *Huguenin* v. *Baseley, Lead. Cas.
in Eq.* 406 ; *Cooke* v. *Lamotte*, 15 *Beav.* 241 ; *Sharp* v. *Leach,*
31 *Beav.* 491 ; *Phillipson* v. *Kerry*, 32 *Beav.* 628.

It is not necessary, however, to rest a decision of this case,
adverse to the deed, on so narrow a foundation as the mere
absence of a power of revocation. The circumstances under
which a voluntary deed was executed, may be shown, with a
view to impeaching its validity ; and if it appears that it
was fraudulently or improperly obtained, equity will decree
that it be given up and canceled. In the present case, there
is no room for doubt that the grantor was induced, by those
in whom she very justly placed confidence, and by whose
better judgment she was willing to be guided, to execute a
voluntary deed, whose effect she and they not only did not
understand, but, on the other hand, misapprehended, and
which, so far from being according to their intentions, was, in
two very important respects, at least, admittedly precisely
the reverse. It was irrevocable, but they all supposed it was
revocable, and intended that it should be so. It deprived
the grantor of the power of sale, but they all supposed that
she would have that power, and intended that she should
have it, clogged only by the necessity of obtaining her
mother's consent and concurrence in any bargain or convey-
ance she might make. The deed contains no power of sale

Carpenter *v*. Easton and Amboy R. R. Co.

whatever. The testimony of all the parties to the transaction, the grantor, her mother, and uncle, has been taken in the cause. It satisfies me that the deed was not "the pure, voluntary, well-understood act of the grantor's mind," (Lord Eldon, in *Huguenin v. Baseley*,) but was unadvised and improvident, and contrary to the intention of all of them.

The fact that the infant children of the grantor are beneficiaries under the deed, will not prevent the court from setting it aside. *Huguenin v. Baseley*, *Everitt v. Everitt*, *supra*. There will be a decree that the deed be delivered up to be canceled.